**E.I. DUPONT DE NEMOURS & COMPANY, Plaintiff,**

v.

**ALLSTATE INSURANCE COMPANY, et al., Defendants.**

**C.A. No. 99C–12–253 JTV.**

Superior Court of Delaware, New Castle County.

Submitted: May 12, 2004.
Decided: Aug. 31, 2004.

---

Richard L. Horwitz and William R. Denny, Potter, Anderson & Corroon, Wilmington, DE, for Plaintiff.

Robert J. Katzenstein, Smith, Katzenstein & Furlow, Wilmington, DE, for Defendant Allstate Insurance Company.

Timothy J. Houseal, and Anthony G. Flynn, Young, Conaway, Stargatt & Taylor, Wilmington, DE, for Defendants International Insurance Company, Lexington Insurance Company and A.I.U. Insurance Company.

Brian L. Kasprzak and Dawn Courtney Doherty, Marks, O'Neill, O'Brien & Courtney, P.C., Wilmington, DE, for Defendants Stonewall Insurance Company and Ludgate Insurance Company Limited.

J.R. Julian, J.R. Julian, P.A., Wilmington, DE, for Defendants European Reinsurance Company of Zurich, Everest Reinsurance Company, Gerling–Konzern Allgemeine Versicherungs–Aktiengesellschaft and Mt. McKinley Insurance Company.

Louis J. Rizzo, Reger & Rizzo, Wilmington, DE, for Defendant Travelers Casualty and Surety Company.

Robert J. Leoni, Morgan, Shelsby & Leoni, Newark, DE, for Defendant Employers Insurance Company of Wausau.

Neal C. Belgam, Blank, Rome, L.L.P., Wilmington, DE, for Defendant First State Insurance Company.

Kevin J. Connors. and Thomas Gerard, Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, DE, for Defendant Royal Indemnity Insurance Company.

Felice Glennon Kerr, The Bayard Firm, Wilmington, DE, for Defendant Geico Insurance Company.

John S. Spadaro, Murphy, Spadaro & Landon, P.A., Wilmington, DE, for Defendants Underwriter's at Lloyd's of London, Certain London Market Companies and Compagnie D'assurances Maritimes Aeriennes Terrestries.

R. Karl Hill, Seitz, Van Ogtrop, & Green, P.A., Wilmington, DE, for Defendants Equitas Limited and Equitas Reinsurance, Ltd.

## OPINION

VAUGHN, Resident Judge.

In this civil action the plaintiff, E.I. du Pont de Nemours & Company ("Dupont"), seeks declaratory relief and money damages against numerous insurance companies from which it purchased excess umbrella liability insurance policies prior to March 1, 1986. Dupont alleges that the defendants are jointly and severally obligated, pursuant to the terms of their respective policies, to indemnify it for liabilities arising from the sale of a product known as Delrin. Delrin was produced by Dupont and used by other companies to make acetal fittings for polybutylene pipe plumbing systems ("PB systems"). As a result of alleged defects in Delrin, Dupont has been subjected to many thousands of claims for damages from owners of residential housing units which were equipped with PB systems.

A number of motions are currently before the Court. In this opinion, I address the following:

1. Dupont's Motion for Summary Judgment on Phase One Issues Directed to 1983–Year Insurers.[1]

2. Certain Defendants' Motion for Summary Judgment on the Number of Occurrences.[2]

3. Certain Defendants' Motion for Summary Judgment Concerning Certain Phase One Issues.[3]

1. The 1983–Year Insurers to whom this Motion is directed are Allstate Insurance Company, as successor-in-interest to Northbrook Excess and Surplus Insurance Company ("Allstate"); International Insurance Company ("International"); Lexington Insurance Company ("Lexington"); Mt. Mckinley Insurance Company, f/k/a Gibraltar Casualty Company ("Mt. McKinley"); Employers Insurance of Wausau ("Wausau"); First State Insurance Company ("First State"); AIU Insurance Company ("AIU"); Royal Insurance Company ("Royal"); Government Employees Insurance Company ("GEICO") and Travelers Casualty & Surety Company, f/k/a Aetna Casualty & Surety Company ("Travelers"). The other insurers subscribing to the 1983–84 policy year not listed above as "1983–Year Insurers" are not the subject of this action and/or this motion either because they have reached a settlement-in-principle with Dupont or because they are insolvent and thus not subject to suit.

2. Defendants joining this motion are TIG Insurance Company, successor-by-merger to International Insurance Company and International Surplus Lines Insurance Company, Employers Insurance of Wausau, a Mutual Company, First State Insurance Company, AIU Insurance Company, Lexington Insur-

ance Company, Everest Reinsurance Company, f/k/a Prudential Reinsurance Company, Mt. McKinley Insurance Company, f/k/a Gibraltar Casualty Company, Royal Indemnity Insurance Company, and Stonewall Insurance Company.

3. The following defendants join in this submission: Allstate Insurance Company, as successor in interest to Northbrook Excess & Surplus Insurance Company, f/k/a Northbrook Insurance Company; TIG Insurance Company, successor-by-merger to International Insurance Company and International Surplus Lines Insurance Company; First State Insurance Company; Government Employees Insurance Company; Mt. McKinley Insurance Company f/k/a Gibraltar Casualty Company; Everest Reinsurance Company f/k/a Prudential Reinsurance Company; AIU Insurance Company; Lexington Insurance Company; Employers Insurance of Wausau, a Mutual Company; Royal Indemnity Insurance Company; Ludgate Insurance Company Ltd.; European Reinsurance Co. of Zurich f/k/a European General Reinsurance Co. of Zurich; Gerling Konzern Globale Rueckversicherungs–Aktiengesellschaft; and Stonewall Insurance Company. The following Defendants have been dismissed since the filing of these motions: Allstate Insurance Company

## FACTS

The facts, which are taken largely from Dupont's brief in support of its motion and its presentation at oral argument, are as follows.

In 1983 Dupont began manufacturing and selling an acetal resin plastic material known as "Delrin," which was purchased and used by other companies to mold fittings for polybutylene pipe plumbing systems, which were installed in residential housing units. PB systems were developed by Shell Chemical Company ("Shell"), which made the polybutylene material and sold it to various manufacturing companies that made the plumbing pipes. These companies also manufactured pipe fittings made with acetal plastic material rather than polybutylene. The original manufacturer of acetal plastic material was Hoechst–Celanese Corporation ("Celanese"), which called its product "Celcon." Between 1978 and 1983, Celanese supplied all of the acetal plastic material for the manufacture of fittings for PB plumbing systems. In 1983, Dupont entered the market with its product, Delrin. Beginning in that year, both Dupont and Celanese sold acetal plastic material to the fitting manufacturers, and both Dupont's Delrin and Celanese's Celcon were used to make fittings that were incorporated into PB systems installed across the country. Dupont manufactured and sold Delrin until 1989. In all, it is estimated that beginning in 1978 and continuing until 1989, PB systems with acetal fittings were installed in millions of homes across the United States and Canada.

In 1987, Dupont received service of its first lawsuit filed on behalf of homeowners seeking damages on account of property damage allegedly caused by defective PB systems. This lawsuit alleged that Dupont, along with Shell, Celanese, and other entities, was liable for damages because PB systems, including their acetal fittings, were inherently defective and caused property damage and loss of use of property. As a result of this lawsuit and several others, Dupont stopped selling Delrin to manufacturers of PB system fittings.

In the ensuing years, Dupont, Shell and Celanese were faced with many lawsuits filed on behalf of homeowners with PB systems. The suits sought compensation for the cost of repair and replacement of the PB plumbing systems, the cost of repairing water damage to homes caused by leaks in PB plumbing systems, and damages for other problems which the homeowners' allegedly experienced as a result of the failure of PB systems.

When used in PB plumbing applications, the acetal material from which the fittings were made experienced degradation. Both Delrin and Celcon acetal fittings are susceptible to chemical attack by elements found in typical household water supplies, such as chlorine, unfavorable pH, and soluble metals.

Thus, when acetal fittings are placed into service in household PB systems and come into contact with water, they begin to degrade. Ultimately, the fittings lose their strength and can no longer contain the water flowing through them—thereby resulting in pipe bursts and leaks.

Since 1989, Dupont has entered into settlements of approximately 200 lawsuits filed by individual plaintiffs or groups of plaintiffs. These settlements include settlements of lawsuits brought by property owners, as well as settlements of actions

as successor-in-interest to Northbrook Excess and Surplus Insurance Company, f/k/a/ Northbrook Insurance Company and TIG Insurance Company, successor-by-merger to International Insurance Company and International Surplus Lines Insurance Company. Ludgate Insurance Company Ltd. is now in bankruptcy.

brought by fitting manufacturers, such as Brass–Craft, which were themselves the subject of homeowner claims. Some PB system lawsuits against Dupont are still pending.

In addition, in response to the many homeowner claims in the late 1980's and early 1990's, Shell, Celanese and Dupont established a facility in Plano, Texas, known as the Plumbing Claims Group ("PCG") to address claims without the need for the homeowner to resort to litigation. Through this facility, Shell, Celanese and Dupont have jointly funded the repair and replacement of approximately 167,000 damaged PB systems.

In the mid–1990's Dupont, Shell and Celanese entered into negotiations with various claimants' counsel for a national class-action settlement of all PB claims. Dupont reached such a class-action settlement in an Alabama class-action lawsuit captioned *Garria Spencer v. Shell Oil Co.*[4] ("*Spencer*"). This settlement, which was approved in November 1995, provided that Dupont would pay a flat 10% share of the costs borne by homeowners with PB systems with acetal fittings who had replaced their systems.

Shortly after the *Spencer* settlement, Shell and Celanese entered into another national class-action settlement in a Tennessee case captioned *Cox v. Shell Oil Co.*[5] ("*Cox*"). Under the *Cox* settlement, which was approved by the court in 1995, Shell and Celanese agreed to pay for the replacement of PB systems of homeowners who qualified for relief.

Following the *Spencer* and *Cox* national class-action settlements, Dupont, Shell and Celanese entered into an agreement, dated November 17, 1995 (the "1995 Three–Party Agreement"), under which they agreed to settle the claims asserted against each other relating to their past costs, and they agreed on funding and payment mechanisms for the national class-action settlements on a going-forward basis.

Under the Agreement, Dupont agreed to pay the 10% share to which it committed itself in *Spencer* on claims involving PB systems with acetal fittings which Shell and Celanese were settling in *Cox*, through the *Cox* class-action claims facility, which was known as the Consumer Plumbing Recovery Center ("CPRC").

Under the *Spencer* class-action agreement and the 1995 Three–Party Agreement, Dupont pays 10% of the costs associated with resolving all claims involving acetal fittings made with either Celron or Delrin. It is the position of Dupont that this arrangement was practical and reasonable because, *inter alia*, Delrin acetal fittings and Celcon acetal fittings were used interchangeably in PB systems after 1983, and were visually indistinguishable. Dupont states that it would have been difficult, and very costly, for the CPRC to inspect each fitting in the PB systems of hundreds of thousands of claimants' homes to determine whether the fitting was made of Delrin rather than Celcon. Dupont further states that, in order to save substantial costs of administering the class-action settlements, the parties agreed not to attempt to determine whether the fittings in a particular claimant's PB plumbing system were made of Celcon or Delrin or both. Rather, Dupont states, both Dupont and Celanese agreed to pay a percentage of the total cost of all claims arising from PB plumbing systems with acetal fittings. Dupont further states that its agreement to pay 10% of the costs of all claims involving acetal fittings avoided the very real litigation risk of a higher percentage of liability being imposed on Dupont at trial

---

**4.** Case No. CV–94–074 (Cir. Ct. Greene County, AL).

**5.** Civ. A. No. 18844, 1995 WL 775363 (Ch. Ct. Obion County, TN).

or in other resolutions of the claims. The parties, however, have not entered into any stipulations regarding Dupont's settlements.

In the course of Dupont's settlements of PB claims, both in the context of litigation and through the various PB claims facilities that have been established, such as the PCG, the CPRC and others, Dupont has collected relevant information about 453,339 settled claims. This information has been maintained by Dupont, among other places, on a computer data base (the "PB Claims Data Base"). The PB Claims Data Base includes, for each claim, the claimant's name and address, the settlement amount and the date the claimant's PB system was installed (if known), among other information. The information in the PB Claims Data Base, as of June 30, 2002, has been stipulated by the parties.

An analysis of the claims in the PB Claims Data Base shows that there were 121,807 claims involving installation dates prior to the 1983 policy year, 39,775 claims involving systems installed during the 1983 policy year, 44,702 claims involving systems installed during the 1984 policy year, 45,597 claims involving systems installed during the 1985 policy year, 164,782 claims involving systems installed after the 1985 policy year, and 36,676 claims of which the installation date is unknown.

The parties have stipulated that:

With respect to each Claim at issue, physical injury or direct damage to, or destruction of, tangible property takes place continuously during each policy period from the time that each Claimant's System is placed into service in the Claimant's Property Unit until the End Date.

The parties reserved for determination in a future litigation phase the question of what constitutes the "End Date." It is also undisputed that the damage, although continuous and progressive, was not uniform from the date of installation to the End Date.

As a result of the hundreds of thousands of PB claims asserted against Dupont, and the related litigation and other costs, Dupont had incurred $231,342,739 in liabilities arising from its manufacture and sale of Delrin acetal resin for use in making fittings for PB systems as of December 31, 2003. According to Dupont, approximately $25,807,571 of these costs, plus defense costs, are not associated with any particular claim. They include such things as notice costs and plaintiffs' counsel fees paid in class actions.

From March 1, 1967 forward until today, Dupont has maintained a comprehensive general liability insurance program. For each policy year, there is a "per-occurrence" self-insured retention ("SIR") amount and then multiple layers of excess liability insurance providing coverage above the SIR amount. In many cases, each layer of excess coverage in a given policy year is subscribed to by multiple insurance companies. For example, in the March 1, 1983 to March 1, 1984 policy year ("1983–year"), there is a $50 million per occurrence SIR, followed by four layers of excess insurance totaling $145 million of coverage. Each layer of excess coverage is subscribed to by multiple insurers.

Beginning March 1, 1986 and for the relevant period thereafter, Dupont obtained most of its liability insurance from its Bermuda-based captive insurers, Danube Insurance Ltd. and Wabash Insurance Ltd. (collectively, "Danube"), which in turn were 100% reinsured by Bermuda-based insurers, including X.L. Insurance Company ("XL") and A.C.E. Insurance Company ("ACE"). Like the pre–1986 insurers, Danube, XL and ACE provided liability coverage with a $50 million per-occurrence SIR.

Dupont has entered into settlements with its post-March 1, 1986 insurers, and they are not parties to this action.

## PHASE ONE ISSUES

The parties agree that the most significant dispute between them centers around an allocation issue—specifically, the manner in which Dupont's PB liabilities should be allocated to insurers among the various years involved and the operation of the $50 million per-occurrence SIR in the relevant policy periods. As a result, the parties agreed upon phasing of this litigation to have the Court decide the allocation issue first and thereby defer, to a later phase of the action if necessary, the litigation of any other coverage defenses asserted by the insurers. With respect to the allocation issue, Dupont contends that all of its PB liabilities can be assigned to a single policy year and that Dupont need only bear one $50 million SIR for all PB liabilities. By contrast, the insurers assert that Dupont's PB liabilities should be spread among multiple policy years and that Dupont must bear a separate $50 million SIR for each of those years before it can obtain any coverage.

The parties' agreement on phasing the action was approved by the Court in the form of a Case Management Order. As described in the now-operative Second Amended Case Management Order, the Phase One issues are as follows:

(a) the appropriate allocation theory (*e.g.*, joint-and-several, pro rata, modified pro rata, etc.) to be utilized in determining any coverage obligation that may be imposed on the defendants for the underlying polybutylene claims for which Dupont seeks coverage ("the Claims");

(b) the manner in which the self-insured retention(s) ("SIR(s)") of any relevant policies will be applied to the Claims;

(c) the number of occurrences;

(d) the coverage obligations, if any, of each of the policies placed at issue in Dupont's Amended Complaint that were in force from March 1, 1983 to March 1, 1986, with respect to Claims related to installations of polybutylene plumbing systems taking place either prior to March 1, 1983, or after a policy's expiration, subject to the coverage defenses to be litigated in a subsequent phase; and

(e) the effect of Dupont's submission of claims to, settlements with, and receipt of payments from post–1986 insurers (collectively, "Phase One Issues").

## RELEVANT POLICY LANGUAGE

The relevant policy language for purposes of the motions is as follows:

The insuring agreement states that:

Underwriters hereby agree, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay ... by reason of the liability:-

for damages on account of:-

(ii) Property Damage caused by or arising out of each occurrence happening anywhere in the world.

The term, "Property Damage," is defined as follows:

The term "Property Damage" wherever used herein, means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The term, "Occurrence," is defined as follows:

The term "Occurrence" wherever used herein shall mean an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence. All Personal Injury or Property Damage arising out of a common condition in goods or products manufactured, sold, handled or distributed by the Named Insured shall be deemed one occurrence.

## DUPONT'S CONTENTIONS

Dupont contends that all of its liabilities and losses relating to PB claims arise out of one "Delrin occurrence," because all of the PB claims arise out of a "common condition" of the product. It contends that where there has been an "occurrence" which gives rise to property damage taking place during multiple policy periods, the policyholder is entitled to choose the policies in any one of these triggered policy periods to provide coverage for "all sums" which the insured becomes liable to pay arising out of that occurrence. It has selected the 1983–year as that year. It contends that the 1983–year insurers are liable for "all sums" that Dupont is liable to pay arising from the Delrin occurrence, subject only to that year's $50 million SIR and the stated limits of their respective policies, except those liabilities for which Dupont has been reimbursed by insurers in other years, regardless of whether some of the liabilities are attributable to PB systems installed before or after the 1983 year. It also contends that Dupont's settlements with insurers in other years have no effect on the coverage obligation of the 1983–year insurers, except for the giving of a credit for amounts paid by insurers in other years. It contends that under the "all sums" language, the liability of insurers who issued policies for one year during which coverage is triggered by the occurrence, such as the 1983 policy year, is joint and several with insurers who issued policies for other triggered years, such as the 1984 and 1985 years. Under this approach, the policies for these three years would each provide joint and several coverage for all sums which Dupont is liable to pay for its total PB system liabilities.

## THE DEFENDANT–INSURERS' CONTENTIONS

In their Motion for Summary Judgement on the Number of Occurrences, certain defendants contend that Celron claims which Dupont allegedly agreed to assume in its settlement are not an occurrence under the policies; that if they are an occurrence, they are a separate occurrence from the Delrin claims; and that the Delrin claims arise out of more than one occurrence and involve at least two "common conditions."

In their Motion for Summary Judgment Concerning Certain Phase One Issues, certain defendants contend that they have no coverage obligations for claims or liabilities arising out of PB plumbing systems installed after the expiration of their policy periods; that they have no coverage obligations for claims or liabilities arising out of PB plumbing systems installed before March 1, 1983, that is, before Delrin was put on the market; that Dupont must separately and independently satisfy the full SIR underlying each policy period in which Dupont seeks or has sought coverage and may not use the same claim payments to satisfy separate SIR's; and that where property damage occurs both during and outside of a defendant's policy period, any coverage obligations that defendant might have for such property damage is limited to that portion of such property damage occurring during the policy period. As to

this last contention, the defendants contend that liability should be pro rated among policy years.

## STANDARD OF REVIEW

Summary judgment should be rendered if the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[6] The facts must be viewed in the light most favorable to the non-moving party.[7] Summary judgment may not be granted if the record indicates that a material fact is in dispute, or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances.[8] However, when the facts permit a reasonable person to draw but one inference, the question becomes one for decision as a matter of law.[9]

## DISCUSSION

■ The proper construction of any contract, including an insurance contract, is purely a question of law.[10] When the language of an insurance contract is unequivocal, "a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities[,] and duties to which the parties had not assented."[11]

Dupont relies heavily upon the case of *Hercules, Inc. v. AIU Ins. Co.*[12] In that case federal and state entities and a number of private parties filed suit against the Hercules company for cleanup costs and other damages arising from years of pollution at a manufacturing site at Jacksonville, Arkansas. Hercules had environmental cleanup claims from other sites, but only the Arkansas site is considered in the opinion. Hercules sought insurance coverage for the damages from insurance companies which had issued policies between 1960 and 1980. Because of pollution exclusions contained in some of the policies, only policies issued between 1964 and 1970 provided coverage. Those policies, like the ones here, insured against "all sums" which Hercules became "obligated to pay by reason of liability . . . for damage . . . on account of . . . property damage . . . caused by or arising out of each occurrence." A jury found that property damage from pollution occurred in every year from 1957 through 1980. The jury also concluded that the environmental property damage was the result of a single occurrence as defined under the applicable policies.[13]

The trial court held that liability should be allocated pro rata among the insurers who had issued the 1964–1970 policies according to each one's time on the risk.[14]

6. Superior Court Civil Rule 56(c).

7. *Guy v. Judicial Nominating Comm'n,* 659 A.2d 777, 780 (Del.Super.1995) *Figgs v. Bellevue Holding Co.,* 652 A.2d 1084, 1087 (Del.Super.1994).

8. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

9. *Wootten v. Kiger,* 226 A.2d 238 (Del.1967).

10. *Aetna Cas. and Sur. Co. v. Kenner,* 570 A.2d 1172, 1174 (Del.1990).

11. *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del.1992).

12. 784 A.2d 481 (Del.2001). Dupont cites other cases in support of its position as well.

13. The definition of "occurrence" set forth in the Supreme Court's opinion is the same as the first two sentences of the definition of "occurrence" in the policies in this case.

14. This was done by (a) dividing the property damage into a per diem amount over the period from 1957 to 1980, (2) multiplying that figure by the number of days during which the applicable policies were issued between 1964 and 1970, (3) reducing the product by a similarly calculated, pro rata portion of Hercules' self-insured retention, and (4) allocat-

The Delaware Supreme Court agreed with Hercules that the trial court committed error by allocating loss according to a pro rata formula. It held that pro rata allocation was inconsistent with the "all sums" provisions in the policies. Citing the earlier case of *Monsanto Co. v. C.E. Heath Compensation and Liability Ins. Co.*,[15] it reasoned that the definition of "occurrence," which triggers coverage, did not define the extent of coverage; and that insurers who issued the 1964–1970 policies were jointly and severally liable for all property damage caused by the single occurrence, because under the policy language, each had agreed to indemnify Hercules for "all sums" for which it became liable for a covered risk, not a pro rata sum. The Supreme Court discussed other issues as well, but Dupont relies upon the case for its analysis of "occurrence," "all sums," and joint and several liability.

There are two material circumstances present in this case, however, which were either not present or not discussed in *Hercules*, which lead me to reject Dupont's argument that under *Hercules* all of its PB system liabilities are covered under the 1983–year policies.

■ One is that the property damage involved in this case is clearly divisible, in part, among policy years. The damage to one PB system can be separated from the damage to another. The other is that the relevant policy language in this case includes a definition of "Property Damage," a phrase which appears not only in the definition of "occurrence," but in the insuring agreement itself, which defines property damage, in relevant part, as "physical injury to or destruction of tangible property which occurs during the policy period." Thus, the insuring agreement in this case is an agreement to pay "all sums" for

liability for damages on account of "property damage," *i.e.* injury or destruction of property which occurs during the policy period, caused by or arising out of an occurrence. This language excludes from coverage liability which is clearly attributable to divisible, separate property damage which occurs outside the policy year.

Accordingly, after considering the policy language, the parties' property damage stipulation, the parties' arguments and the authorities cited in their briefs and at oral argument, and the entire record, I find as follows:

■ *Nature of the "occurrence(s)".* The relevant occurrence (or occurrences) is the damage caused by Dupont's product, Delrin. Damage caused by Celcon is not a relevant occurrence under Dupont's policies, because no Dupont liability can arise from damage caused by Celcon. In addition, the definition of "occurrence" provides that "Property Damage arising out of a common condition in goods or products manufactured, sold, handled or distributed by the named Insured [Dupont] shall be deemed one occurrence." From this definition it follows that damage arising out of Celcon, which was not manufactured or sold by Dupont, is not part of an occurrence arising out of Delrin damage, even if the defects in Celcon and Delrin are a "common condition" of each other. Thus, the occurrence arising out of Delrin, if it is one occurrence, first occurred, at the earliest, in 1983, when Delrin entered the market, and continued in each year thereafter during which Delrin damage occurred. The number of Delrin occurrences is discussed below.

I note that the insurers argued in their briefs and at oral argument that Dupont

ing the resulting figure pro rata among the 1964–1970 policies according to the time on the risk.

**15.** 652 A.2d 30 (Del.1994).

assumed liability for Celcon damage when it entered into settlements of the many claims asserted against it. Dupont opposes this argument and contends that its settlements were based upon its liability for Delrin damage as a proportionate share of the whole Delrin–Celcon market. The rulings set forth in this opinion are intended to address only the insurance coverage issues raised. No ruling is intended to limit or diminish the amount of liabilities which Dupont claims it has incurred because of Delrin.[16]

■ *Coverage for claims relating to pre–1983 installations.* The policies in effect between March 1, 1983 and March 1, 1986 cannot have any liability for damage to PB systems installed before 1983, because Delrin was not in existence on the market before 1983. Any damage to these systems could be caused only by Celcon. The insurers are obligated to indemnify Dupont only for sums which Dupont becomes obligated to pay by reason of its liability for damages on account of property damage arising out of an occurrence. It is not possible for Dupont to have any liability for damage to pre–1983 installations which do not contain its product.[17]

An exception to this finding exists where evidence shows that a fitting made with acetal plastic material was added to a pre–1983 system after Delrin entered the market.

Therefore, it follows that Dupont has no claim against the March 1, 1983 to March 1, 1986 policies for any damage to any PB system installed before 1983, except where evidence shows that a fitting made with acetal plastic material was added to a system after Delrin became available.

■ *Coverage for claims relating to installations after a policy expired.* Since the 1983, 1984 and 1985–year policies provide insurance for all sums which Dupont becomes obligated to pay by reason of liability for damages on account of property damage caused by or arising out of an occurrence, and "property damage" is expressly defined as "physical injury to or destruction of tangible property which occurs during the policy period," coverage under a particular year's policy cannot exist for damage to a PB system which undisputed facts show was not installed, and therefore did not exist and could not be damaged, until after the policy year expired.

As to this issue, Dupont argues that the 1983 policy covers "all sums" for "liability for damages on account of Property Damage," not "Property Damage." However, "on account of Property Damage" qualifies the "liability for damages," for which "all sums" are covered by the policy. Thus, it is not coverage for "all sums" for liability for damages caused by or arising out of an occurrence. It is coverage for "all sums" for liability for damages due to property damage which occurs during the policy year, caused by or arising out of an occurrence. Coverage is not provided for liability for damages due to property damage which occurred after the policy period expired which is clearly separate and divisible from property damage which occurred during the policy period. Accordingly, Dupont's contention that the 1983 policy covers all of its Delrin liabilities is rejected.

---

**16.** For this reason, I do not grant in this opinion a defense request for a declaration that the defendants have no liability for the amounts paid by Dupont to U.S. Brass, a company which used Celcon in all of its PB system fittings and never bought Delrin.

**17.** *Armstrong World Indus. Inc. v.* Aetna Cas. & Sur. Co., 45 Cal.App.4th 1, 52 Cal.Rptr.2d 690 (1996); *Keene Corp. v. Insurance Co. of N. Am.,* 667 F.2d 1034 (D.C.Cir.1981); *Insurance Co. of N. Am. v. Forty–Eight Insulations,* 633 F.2d 1212 (6th Cir.1980).

Dupont argues that claims arising from the "Delrin occurrence" should not be individually analyzed, that its Delrin liabilities were not settled on a claim-by-claim basis, that they were settled in large group settlements involving hundreds of thousands of claims being resolved in one settlement, that settlement of this mass tort occurrence on a market share basis was reasonable and in the best interest of the insured, that many of the Delrin liabilities, such as counsel fees and notice fees in class action suits, are not associated with any particular claim, that information pertaining to some PB systems is incomplete or inaccurate, and that failure to analyze the Delrin liabilities as a whole does not recognize the realities of mass tort settlement involving multiple defendants. However, the fact that damage caused by Delrin is separate and divisible from one PB system to another is material and must be given due regard. Dupont's arguments do not persuade me that the policy language should be construed in the manner urged by it.

█ *Allocation where damage to a PB system occurs during two or more policy years.* Where damage to a single PB system, which under the parties' stipulation begins with installation and ends with the "End Date," occurs over two or more policy years, the coverage of those years' policies for the damage to that system is joint and several for all the damage to that system. An example is a system installed in 1983 with an End Date (as that term may ultimately be defined), during the 1984 or a later policy year. In each policy year from 1983 to the End Date, the liability for damages for damage occurring to that system during the policy year is one and the same, *i.e.* replacement of the whole system plus any consequential damages. Based upon the undisputed facts as I understand them, the damage to the system each year, although progressive, is indivisible from damage to the system in any preceding or succeeding year between installation and the End Date.[18] Since damage begins upon installation, liability for replacement of the system arises during that policy year, during the next policy year, and so on until the End Date.[19] The fact that the damage may become progressively worse each year does not alter this analysis. This approach is consistent with the policy language and with *Hercules*[20] and *Monsanto*.[21]

The defendants' contention that liability should be allocated pro rata based upon the time on the risk is rejected. No language in the policies has been offered which would support such an allocation. A case which has applied pro rata allocation to the same policies which are at issue here is the case of *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*[22] However, *Admiral* was influenced by equitable considerations which are not present here. For example, joint and several allocation in that case would have resulted in insurers being held liable for damage which occurred during years prior to 1967 when Dupont had consciously chosen not to buy any insurance at all. *Admiral* is distinguishable.

18. It is noted that the policies contain a noncumulation clause under which the limits of liability in a policy are reduced by the amount of a loss which is also covered under a prior year's policy.

19. It must be noted that in this opinion the Court addresses allocation only as it relates to Dupont and its insurers. The Court does not address allocation as it relates to claims for contribution which the insurers may assert against each other.

20. 784 A.2d 481.

21. 652 A.2d 30.

22. 1995 Del.Super. Lexis 488 (Del.Super.).

As mentioned, Dupont has stated that some of its Delrin costs are not associated with any particular claim. It may follow that insurers who issued policies during all of the years during which Delrin damage occurred are jointly and severally liable for these costs. Or it may be that these costs, or some of them, are clearly divisible from one or more policy years. I will defer ruling upon allocation of these costs until the parties have had an opportunity to provide supplemental argument regarding the application of the findings which I have made herein to these costs.

■ *Application of Self–Insured Retentions.* It follows from the foregoing that Dupont's contention that it need exhaust only one $50 million SIR must be rejected. The annual policies involved here are separate, and the $50 million SIR of each must be separately exhausted with claims falling within the scope of that year's coverage. Thus, a claim arising from damage to a PB system installed after the 1983–year policy expired does not apply to the SIR for that year. Where insurers for two or more policy years are jointly and severally liable for the same claims, each year's SIR must be exhausted with separate claims.

■ *Number of Occurrences.* Dupont contends that all Delrin damage is a single occurrence because it arises from a common condition. That condition, Dupont contends, is the susceptibility of Delrin to chemical attack and degradation when used in fittings in PB systems. A defense expert, however, Dr. Broutman, has offered the opinion that damage caused by Delrin arises from two conditions: (1) susceptibility to mechanical failure; and (2) susceptibility to chemical degradation. Dupont contends that the alleged susceptibility to mechanical failure relates to the manufacturing process, not its product, which is sold in the form of pellets. Although I think that Dupont has the much better argument, I conclude that a genuine issue of fact exists as to the number of occurrences which requires that the issue be submitted to a jury.

*Effect of Settlements with Post–1986 Insurers and the First State "No action" clause.* Other issues raised include the effect of settlements with post–1986 insurers upon the 1983 through 1985 year policies, and the effect of a "no action" clause contained in a First State policy. Given the findings made above, it is not clear that rulings on these issues are required. I will defer ruling upon these issues until the parties' have had an opportunity to provide supplemental argument regarding the application of the findings which I have made herein to these issues.

## CONCLUSION

For the foregoing reasons, Dupont's Motion for Summary Judgment on Phase One Issues Directed to 1983–Year Insurers is *denied.* Certain Defendants' Motion for Summary Judgment on the Number of Occurrences is *denied.* Certain Defendants' Motion for Summary Judgment Concerning Certain Phase One Issues is *granted in part* and *denied in part.*

**IT IS SO ORDERED.**